CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

March 13, 2024

LAURA A. AUSTIN, CLERK
BY:
    s/A. Beeson
    DEPUTY CLERK

**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
DANVILLLE DIVISION**

CHARLES MCCALL,

        Plaintiff,

v.

EQUIFAX INFORMATION SERVICES,
LLC, EXPERIAN INFORMATION
SOLUTIONS, INC., TRANS UNION LLC,
and LEXISNEXIS RISK SOLUTIONS, INC.,

        Defendants.

**Case No.:**   4:24cv00011

**COMPLAINT AND
DEMAND FOR JURY TRIAL**

Plaintiff Charles McCall ("Plaintiff") a living, breathing 40-year-old consumer, brings this action on an individual basis, against Equifax Information Services, LLC ("Equifax"), Experian Information Solutions, Inc. ("Experian"), LexisNexis Risk Solutions, Inc. ("LexisNexis"), and Trans Union LLC ("Trans Union") (collectively, the "Defendants") and states as follows:

**INTRODUCTION**

1.     The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

2.     However, unfortunately this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can and do sustain substantial damage,

1

both economically and emotionally, whenever inaccurate or fraudulent information is disseminated and/or obtained about them. In fact, the Defendants acknowledge this potential for misuse and resulting damage every time they sell their respective credit monitoring services to a consumer.

3.  The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

4.  These CRAs sell information to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers, and other similar interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, or a car or mortgage loan.

5.  Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681, et seq. ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile and sell about individual consumers.

6.  One of the primary purposes in requiring CRAs to assure "maximum possible accuracy" of consumer information is to ensure the stability of our banking system:

> The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

15 U.S.C. § 1681(a)(1).

7.  The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

2

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed.

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 cong. Rec. 36570 (1970)] (emphasis added).

8.    In light of these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." *See* 15 U. S.C. § 1681(a)(4).

9.    Plaintiff's claims arise out of the Defendants' blatantly inaccurate reporting, wherein the Defendants reported to Plaintiff's potential creditors that he is "deceased."

10.    Accordingly, Plaintiff brings claims against the Defendants for failing to follow reasonable procedures to assure the maximum possible accuracy of Plaintiff's credit reports, in violation of the FCRA, 15 U.S.C. § 1681e(b).

11.    As part of this action, Plaintiff seeks actual, statutory, and punitive damages, costs and attorneys' fees from the Defendants for their willful and/or negligent violations of the FCRA, 15 U.S.C. § 1681, *et seq.*, as described herein.

## PARTIES

12.    Plaintiff is a natural person residing in Spencer, Virginia, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

13.    Equifax is a limited liability company with a principal place of business located at 1550 Peachtree Street, N.W., Atlanta, Georgia 30309, and is authorized to do business in the

3

Commonwealth of Virginia, including within this District. Equifax can be served through its registered agent Corporation Service Company located at 2 Sun Court, Suite 400 Peachtree Corners, Georgia 30092.

14.    Experian is a corporation with a principal place of business located at 475 Anton Boulevard, Costa Mesa, California 92626, and is authorized to do business in the Commonwealth of Virginia, including within this District.

15.    LexisNexis is a Delaware corporation doing business throughout the United States, including the Commonwealth of Virginia and in this District, and has a principal place of business located at 1000 Alderman Drive, Alpharetta, Georgia 30005. LexisNexis can be served at its registered agent, C T Corporation System, 4701 Cox Rd Ste 285, Glen Allen, VA, 23060 - 6808.

16.    Trans Union is a limited liability company with a principal place of business located at 555 West Adams Street, Chicago, Illinois 60661, and is authorized to do business in the Commonwealth of Virginia, including within this District. Trans Union can be served through its registered agent Illinois Corporation Service Company located at 801 Adlai Stevenson Drive, Springfield, Illinois 62703.

17.    Each Defendant is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). The Defendants regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

## JURISDICTION AND VENUE

18.    This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

4

19.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## SUMMARY OF THE FCRA

20.     The FCRA governs the conduct of consumer reporting agencies in an effort to preserve the integrity of the consumer banking system and to protect the rights of consumers to fairness and accuracy in the reporting of their credit information.

21.     The FCRA was designed to protect consumers from the harmful effects of inaccurate information reported in consumer reports (commonly referred to as "credit reports"). Thus, Congress enshrined the principles of "fair and accurate credit reporting" and the "need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness" in the very first provision of the FCRA. *See* 15 U.S.C. § 1681(a).

22.     Specifically, the statute was intended to ensure that "consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information. *See* 15 U.S.C. § 1681(b).

23.     To that end, the FCRA imposes the following twin duties on consumer reporting agencies: (i) consumer reporting agencies must devise and implement reasonable procedures to ensure the "maximum possible accuracy" of information contained in consumer reports (15 U.S.C. § 1681e(b)); and (ii) consumer reporting agencies must reinvestigate the facts and circumstances surrounding a consumer's dispute and timely correct any inaccuracies (15 U.S.C. § 1681i).

24.     The FCRA provides consumers with a private right of action against consumer reporting agencies that willfully or negligently fail to comply with their statutory obligations under the FCRA.

## THE DEFENDANTS' PRACTICES CONCERNING THE SALE OF REPORTS ON THE "DECEASED"

25.     The Defendants sell millions of consumer reports (often called "credit reports" or "reports") per day. Equifax, Experian, and Trans Union also sell credit scores.

26.     Pursuant to 15 U.S.C. § 1681e(b), consumer reporting agencies, like the Defendants, are required "to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

27.     Pursuant to 15 U.S.C. §§ 1681b and 1681e(a), consumer reporting agencies, like the Defendants, must maintain reasonable procedures to assure that consumer reports are sold only for legitimate "permissible purposes."

28.     Defendants Equifax, Experian, and Trans Union routinely place a "deceased" notation or marking on reports when it is advised by any of its many data furnishing sources (such as banks, debt collectors, etc.) that a given consumer is deceased.

29.     Equifax's, Experian's, and Trans Union's furnishing sources identify "deceased" consumers by marking the "status" of such consumer's responsibility for any subject account with an "X" or "U/UNDESIGNATED" code in the "ECOA" field of an electronic data input format used in the credit reporting industry, known as Metro or Metro 2.

30.     The Defendants do not request or require a death certificate from any of their data sources which advise that a consumer is "deceased" before placing a "deceased" mark in that consumer's credit file.

31.     The Defendants do not request or require any proof from any data source which

advises that a consumer is "deceased," showing that the consumer is in fact deceased before placing a "deceased" mark on that consumer's report.

32. The Defendants do not independently verify with any source that a consumer is in fact deceased before placing a "deceased" mark on that consumer's report.

33. In some cases, in order to assure accuracy, the Defendants may send letters and/or other communications to consumers when certain information that may be considered suspicious or unreliable is furnished about said consumers to be placed in their credit files, such as in cases where consumers have a freeze or fraud alert on their credit report, or in accordance with certain state laws, such as the consumer laws of Colorado.

34. Equifax, Experian, and Trans Union do not have any procedure to notify consumers (such as a next of kin or executor or administrator of the consumer's estate) when an "X" or "U/UNDESIGNATED" deceased code is furnished to them to be placed in said consumer's credit file or report.

35. LexisNexis does not have any procedure to notify consumers (such as a next of kin or executor or administrator of the consumer's estate) when it has received information suggesting the consumer is deceased before adding that information to the consumer's credit file or report.

36. The Social Security Administration ("SSA") maintains the **Death Master File ("DMF")**. The DMF is also known commercially as the Social Security Death Index ("SSDI"). The SSA's DMF as of 2018 contained information on 111 million deaths that have been reported to the SSA. The DMF is created from internal SSA records of deceased persons possessing social security numbers and whose deaths were reported to the SSA. The DMF includes the following information on each decedent, if the data are available to the SSA: social security number, name, date of birth, and date of death.

7

37. Legislation (i.e., the Social Security Act) precludes the sharing of the full DMF with non-benefits paying agencies.

38. Because of the wide use and demand for death records for a variety of industries, SSA has partnered with the U.S. Department of Commerce's National Technical Information Service ("NTIS") to release the Limited Access Death Master File ("LADMF") electronically on a weekly and monthly basis.

39. The SSA receives death reports from many sources, including family members, funeral homes, financial institutions, postal authorities, state information, and other federal agencies. The SSA does not have a death record for all persons; therefore, the SSA does not guarantee the veracity of the DMF. The SSA does not guarantee 100% of the data.

40. The SSA estimates that roughly 12,000 living people are added to the DMF annually, potentially due to clerical error. An erroneous listing can lead to not only a cessation of government benefits, but also the freezing of bank accounts, the inability to buy or rent property, and mistaken accusations of identity theft.[12]

41. The Office of the Inspector General called the error rate "very low," but noted that "SSA's erroneous death entries can lead to mistaken benefit terminations and cause severe financial hardship and distress to affected people…when errors like this occur, it can be a long and difficult process to resurrect your financial health."[3]

42. The Defendants do not have access to the full DMF from the SSA, but rather are subscribers to the NTIS LADMF.

---

[1] *Aviva Dekornfeld (2018-06-20).* "The Plight of the Living Dead". *The Indicator from Planet Money (Podcast).*

[2] Bichell, Rae Ellen (2016-08-10). "Social Security Data Errors Can Turn People into the Living Dead". *National Public Radio.*

[3] "Cases of Mistaken Death Reports Low but Costly | Office of the Inspector General, SSA". *oig.ssa.gov.* 2016-03-24. Archived from the original on 2020-07-16.

43.     Despite being subscribers of the NTIS LADMF, Equifax, Experian, and Trans Union do not cross-reference the "X", or "U/UNDESIGNATED" code received from data furnishers with the LADMF in order to determine whether any given consumer reported as deceased via a furnishing source is also on the LADMF before selling a credit report about said consumer, or at any time.

44.     Equifax, Experian, and Trans Union will only cross-reference the NTIS LADMF to sell additional products for an additional fee to their subscribers regarding information contained within the LADMF.

45.     Despite being a subscriber to the NTIS LADMF, LexisNexis does not cross-reference the information it has received suggesting a consumer is deceased with the LADMF in order to determine whether any given consumer reported as deceased via its source is also on the LADMF before selling a credit report about said consumer, or at any time.

46.     The Defendants fail to employ reasonable procedures that assure that a consumer is actually deceased before placing the "deceased" mark on that consumer's report and selling that report for profit.

47.     Even in instances where other data on the face of the consumer's report indicates that they are not deceased, the Defendants do not employ any procedures to assure that a consumer is in fact actually deceased before placing the "deceased" mark in that consumer's file.

48.     Even in instances where the purportedly deceased consumer communicates directly with the Defendants, the Defendants do not employ any procedures to assure that a consumer is in fact actually deceased before placing the "deceased" mark on that consumer's report.

49.     Once a "deceased" mark is placed upon a consumer's report, Equifax, Experian, and Trans Union will not calculate and will not provide a credit score for that consumer.

9

50.    Upon Equifax's, Experian's, and Trans Union's reports with a "deceased" mark sold to third parties, Equifax, Experian, and Trans Union never calculate or provide a credit score for that consumer and instead report that consumer's credit score as "N/A."

51.    Equifax, Experian, and Trans Union know that third party credit issuers require a credit score in order to process a given credit application.

52.    Equifax, Experian, and Trans Union know that consumers without credit scores are unable to secure any credit from most credit issuers.

53.    Equifax, Experian, and Trans Union know that living consumers are routinely turned down for credit specifically because they are reporting them as "deceased" and without a credit score.

54.    LexisNexis knows that living consumers are routinely turned down for credit specifically because it is reporting them as "deceased."

55.    Equifax, Experian, and Trans Union have been put on notice for years through consumer disputes and lawsuits that living, breathing consumers are turned down for credit specifically because Equifax, Experian, and Trans Union are inaccurately reporting them as "deceased" and without a credit score.

56.    LexisNexis has been put on notice for years through consumer disputes and lawsuits that living, breathing consumers are turned down for credit specifically because LexisNexis is inaccurately reporting them as "deceased."

57.    The Defendants have received and documented many disputes from consumers complaining that Defendants had erroneously marked them as "deceased" on their credit reports.

58.    Equifax, Experian, and Trans Union know that thousands of consumers are erroneously marked as "deceased" on their credit reports via an erroneous furnishing of the "X"

10

or "U/UNDESIGNATED" code.

59. LexisNexis knows that thousands of consumers are erroneously marked as "deceased" on their credit reports.

60. Nevertheless, the Defendants do not employ any procedures to assure that a consumer is actually deceased before adding a "deceased" notation to that consumer's credit file and credit reports.

61. Even consumers who dispute the erroneous "deceased" status on their Equifax, Experian, and Trans Union credit reports continue to be erroneously marked as deceased unless the furnishing source which provided the erroneous "X" or "U/UNDESIGNATED" code in the first instance modifies its reporting first.

62. Equifax, Experian, and Trans Union do not have any independent procedures to change an erroneous deceased status on their own and will merely parrot their furnishing source in the case of a reinvestigation into the accuracy of the deceased status upon a consumer's report, a reinvestigation which is triggered by a consumer dispute.

63. Nor do Equifax, Experian, and Trans Union employ any procedures to limit or stop the furnishing of reports to third parties for consumers that they have marked as "deceased" under any circumstances.

64. LexisNexis does not employ any procedures to limit or stop the furnishing of reports to third parties for consumers that they have marked as "deceased" under any circumstances.

65. For years after a consumer's actual death, the Defendants will continue to sell credit reports about that consumer.

66. The Defendants will only remove a deceased consumer's file from their respective credit reporting databases when it is no longer valuable to them – meaning that no one is continuing

11

to purchase reports about that consumer.

67.     The Defendants charge third parties a fee for reports with a mark that a consumer is deceased ("reports on the deceased") as they would for any other report.

68.     The Defendants profit from the sale of reports on deceased consumers.

69.     Equifax, Experian, and Trans Union have in their respective credit reporting databases many "deceased" tradelines corresponding to distinct credit files for individual consumers that they have marked as "deceased."

70.     The Defendants know that truly deceased consumers do not apply for credit.

71.     The Defendants know that the credit information and reports of truly deceased persons are used by criminals to commit identity theft or credit fraud. Indeed, identity theft using the personal identifying information of deceased consumers is known to the Defendants to be a common and major source of identity theft.

72.     The Defendants know that identity theft and credit fraud are serious and widespread problems in our society.

73.     Equifax, Experian, and Trans Union warn the relatives of truly deceased consumers that identity theft can be committed using the credit reports and information of the deceased and require relatives to provide a death certificate or executorship papers, among other forms of proof, before accessing the deceased consumer's credit information or report.

74.     Equifax, Experian, and Trans Union have no similar death certificate, executorship paper, or any other proof requirements for their data sources, which report a consumer as deceased or for the purchasers of their reports who access the purportedly deceased consumer's information.

75.     The Defendants sell reports on supposedly deceased consumers to third parties in an automated fashion and without any specific or general certification that could reasonably

12

explain a "permissible purpose" for purchasing or using a (supposedly) deceased consumer's credit history and/or report.

76.     For consumers who are deceased, there rarely, if ever, exists a permissible purpose under the FCRA for the Defendants to sell their credit reports, absent a court order.

77.     The Defendants know that such reports contain a vast amount of personal identifying and credit account information on the supposedly deceased consumer, information that can be used to commit identity theft or for other fraudulent purposes.

78.     The Defendants know that their procedures for obtaining and reporting deceased information in regard to a consumer causes consumers economic, emotional, and physical harm, because they have received numerous disputes and have been sued numerous times for such false reports.

79.     The Defendants' conduct in communicating information that a consumer is deceased without taking steps to confirm the accuracy of such information recklessly disregards the rights of the consumer to an accurate consumer report and to be free from information that suggests he may be committing a fraud on a user.

80.     Defendants have all been on notice for decades of the defects in their procedures for reporting deceased notations about consumers, yet have not taken adequate action to correct or curb such defects.

81.     Defendants have been on specific notice at a minimum at least since October 26, 2022, when the Consumer Financial Protection Bureau published an Advisory Opinion specifically addressing the Defendants use and publication of facially false data such as the deceased reporting that is nonsensical such as the deceased reporting about Plaintiff.  87 FR 64689.

13

## FACTUAL ALLEGATIONS

**Plaintiff Applied for Credit Refinancing and was Denied on Multiple Occasions**

82.    Plaintiff co-owns an automotive repair shop. In order to perform certain tasks for his job, Plaintiff requires various tools.

83.    Due to the high costs associated with purchasing such tools, Plaintiff decided to finance his purchase with Matco Tools ("Matco") wherein Plaintiff would make bi-monthly payments for the tools required for his job.

84.    In or around the end of August 2023, Plaintiff applied for financing with Matco in order to purchase tools necessary for Plaintiff's job.

85.    On or about September 9, 2023, Plaintiff's application was approved, and Plaintiff began making bi-monthly payments to Matco.

86.    In or around October 2023, Plaintiff was interested in refinancing his loan with Matco in order to decrease his monthly payment obligation, and spoke with a Matco distributor named Marshall Banks ("Banks") about the same.

87.    Accordingly, on or about October 6, 2023, Plaintiff applied to refinance his loan with Matco.

88.    Inexplicably, Plaintiff's October 6, 2023, refinance application with Matco was denied.

89.    Plaintiff was still very interested in lowering his monthly payment obligations, and submitted a second refinance application one week later, on or about October 13, 2023.

90.    For a second time, inexplicably, Plaintiff's October 13, 2023, refinance application was also denied.

91.    At the time, Plaintiff assumed he had been denied because his credit was simply

14

not good enough to be approved for the requested refinancing of his loan.

92.     As part of the application process, Matco uses consumer reports to determine whether to approve consumer credit applications. For both the October 6 and October 13 refinance applications, Plaintiff provided Matco with his personal identification information, including his Social Security Number, and authorized Matco to obtain copies of his consumer reports in order to determine Plaintiff's credit eligibility for refinancing purposes.

93.     Upon information and belief, as part of Matco's processing of Plaintiff's October 6 and October 13 refinance applications, Matco attempted to order a consumer report about Plaintiff from one or more of the Defendants.

94.     Upon information and belief, Matco reviewed a consumer report about Plaintiff that was obtained by Matco from one or more of the Defendants.

95.     Upon information and belief, Matco denied Plaintiff's October 6 and October 13 refinance applications based upon the contents of a consumer report about Plaintiff that one or more of the Defendants' credit reports sold to Matco.

96.     Specifically, and upon information and belief, Matco denied Plaintiff's October 6 and October 13 refinance applications because a consumer report that Matco bought from one or more of the Defendants reported that Plaintiff was deceased.

97.     Alternatively, upon information and belief, Matco was unable to obtain consumer reports concerning Plaintiff because the Defendants were reporting that Plaintiff was deceased.

98.     Plaintiff was extremely frustrated at the denials of his refinance applications, because he very much needed to lower his monthly payment obligations.

99.     Desperate to secure refinancing, Plaintiff was forced to re-apply for refinancing with a cosigner, Banks.

15

100.    On or about October 20, 2023, Plaintiff re-applied for refinancing online with Banks as a cosigner.

101.    This time, with the addition of Banks as a cosigner, Plaintiff's refinance application was finally approved.

**Plaintiff Applied for a Capital One Credit Card in October 2023**

102.    Satisfied that he had been able to refinance his loan and assuming at the time that he his refinance applications had been denied because of poor credit, Plaintiff attempted to start rebuilding his credit.

103.    Plaintiff set out to establish a more robust credit history, recognizing the value of an established and positive credit history.

104.    Plaintiff was also interested in obtaining a credit card so he could use it for his business expenses and everyday purchases.

105.    Plaintiff received a Capital One credit card promotion code from his friend, and sought to take advantage of the same.

106.    Accordingly, on or about October 23, 2023, Plaintiff completed and submitted an online pre-approval application with Capital One for a credit card.

107.    As part of the application process, Capital One uses consumer reports to determine whether to approve consumer credit applications. Plaintiff provided Capital One with his personal identification information, including his Social Security Number, and authorized it to obtain copies of his consumer reports.

**Capital One Denies Plaintiff's Credit Card Application in October 2023**

108.    Upon information and belief, Capital One ordered and reviewed a consumer report about Plaintiff that was obtained from one or more of the Defendants on or about October 23, 2023.

16

109. Upon information and belief, on or about October 23, 2023, one or more of the Defendants published information concerning Plaintiff to Capital One in response to his credit application.

110. Upon information and belief, one or more of the Defendants sold Capital One a consumer report about Plaintiff that reported that Plaintiff was deceased.

111. To that end, on or about October 23, 2023, Plaintiff received an adverse action notice from Capital One denying his credit card application. Specifically, Capital One denied Plaintiff's credit application because one or more of the Defendants had reported that Plaintiff was deceased.

112. Following the Capital One denial, Plaintiff realized for the first time that the Matco denials may have also been related to one or more of the Defendants reporting that Plaintiff was deceased.

113. It is plainly inaccurate to report in a consumer report that a living consumer is "deceased."

114. Specifically, it was inaccurate for one or more of the Defendants to publish information to Matco and/or Capital One indicating that Plaintiff was deceased when Plaintiff was very much alive. Certainly, Plaintiff was not, and has never been, deceased.

115. Plaintiff was deeply stressed and disappointed at the Matco refinance denials and the Capital One denial.

116. Moreover, Plaintiff found the information reported by the Defendants to be very distressing, confusing, and shocking.

117. It is unreasonable to maintain procedures that allow a consumer reporting agency to report that a living consumer is deceased.

17

118.    Therefore, the Defendants each violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy of the credit information it published and maintained concerning Plaintiff.

**Plaintiff Confirmed That the SSA Had Not Erroneously Recorded
Plaintiff's SSN as Belonging to a Deceased Person**

119.    Confused and shocked by the news of his untimely demise, Plaintiff contacted a friend of his who worked at the local office for the SSA.

120.    On or about October 27, 2023, Plaintiff called his friend and asked if his friend was able to check in the SSA's system whether Plaintiff's SSN had been erroneously recorded as belonging to a deceased person.

121.    On or about October 27, 2023, Plaintiff's friend confirmed that the SSA's records did not reflect any deceased notation associated with Plaintiff's SSA records.

122.    The same day, Plaintiff's friend had his SSA supervisor print out a letter for Plaintiff which indicated very clear that Plaintiff was not deceased.

**Plaintiff's Original Matco Denial**

123.    Growing increasingly concerned about his credit denials, Plaintiff decided to reach out to Matco to seek additional information about Plaintiff's refinance denials.

124.    On or about November 10, 2023, Plaintiff called Matco and spoke with a representative.

125.    The Matco representative indicated to Plaintiff that he had been denied because there was insufficient information provided by one or more of the Defendants to populate Plaintiff's credit score.

126.    As detailed herein, it is common that when a consumer reporting agency reports a deceased notation in a consumer's file, the consumer reporting agency is unable to generate a credit

18

score for that consumer.

127. In short, the Matco representative's statements to Plaintiff all but confirmed that a deceased notation reported in Plaintiff's credit file from one or more of the Defendants was the direct cause of Plaintiff's refinance denials.

**Plaintiff Sustained Damages as a Result of the Defendants' Inaccurate Reporting**

128. As a direct result of the Defendants' inaccurate consumer reporting, Plaintiff sustained severe emotional distress. Specifically, Plaintiff endured a substantial amount of stress and anxiety after being denied credit as Defendants' reporting that Plaintiff was "deceased."

129. Plaintiff has lost a significant amount of weight due to the stress associated with the inaccurate reporting.

130. Plaintiff has also suffered from countless nights of poor sleep, no sleep, or interrupted sleep as his mind frequently drifts to thoughts of his credit, future issues caused by the Defendants, and/or other related matters.

131. Plaintiff often stays up at night crying because he is unable to obtain credit.

132. As a result of the conduct of the Defendants, it became nearly impossible for Plaintiff to obtain credit.

133. Plaintiff feels extremely embarrassed that he has had to rely on his business partner to obtain loans for their business because Plaintiff is unable to obtain loans or credit by himself.

134. Plaintiff lives paycheck-to-paycheck, and because of his difficulties in securing credit, Plaintiff has had to frequently reach out to friends and family members to ask for financial support, causing Plaintiff a significant amount of additional embarrassment, humiliation, and shame.

135. At all times pertinent hereto, the Defendants were acting by and through their

agents, servants, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Defendants herein.

136. At all times pertinent hereto, the conduct of Defendants, as well as that of their respective agents, servants, and/or employees, was intentional, willful, reckless, grossly negligent and in utter disregard for federal law and the rights of Plaintiff herein.

137. The Defendants are aware of the shortcomings of their procedures and intentionally choose not to comply with the FCRA to lower their costs. Accordingly, the Defendants' violations of the FCRA are willful.

138. As a result of the Defendants' conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase; detriment to his credit rating; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

### CLAIMS FOR RELIEF

### COUNT I
### 15 U.S.C. § 1681e(b)
### Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy

139. Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

140. The FCRA imposes a duty on consumer reporting agencies to devise and implement procedures to ensure the "maximum possible accuracy" of consumer reports, as follows: "Whenever a consumer reporting agency prepares a consumer report, it shall follow reasonable procedures to assure *maximum possible accuracy* of the information concerning the individual about whom the report relates." 15 U.S.C. §1681e(b) (emphasis added).

141. Upon information and belief, on numerous occasions, the Defendants prepared

20

patently false consumer reports concerning Plaintiff.

142.   Despite actual and implied knowledge that Plaintiff is not dead, the Defendants readily sold such false reports to one or more third parties, thereby misrepresenting Plaintiff, and ultimately Plaintiff's creditworthiness.

143.   Each Defendant violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files they each published and maintained concerning Plaintiff.

144.   As a result of the Defendants' conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase; detriment to his credit rating; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

145.   The Defendants' conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, they were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

146.   Plaintiff is entitled to recover attorneys' fees and costs from the Defendants in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for the following relief:

i.      Determining that Defendants negligently and/or willfully violated the FCRA;

ii.     Awarding Plaintiff actual, statutory, and punitive damages as provided by the FCRA;

iii.    Awarding Plaintiff reasonable attorneys' fees and costs as provided by the FCRA;

21

and,

iv.    Granting further relief, in law or equity, as this Court may deem appropriate and

just.

## **DEMAND FOR JURY TRIAL**

Plaintiff is entitled to and hereby demands a trial by jury on all issues so triable.

RESPECTFULLY SUBMITTED this 13th day of March 2024.

**CONSUMER ATTORNEYS**

*/s/Susan Mary Rotkis*
Susan Mary Rotkis
VSB 40693
Attorney for Plaintiff Charles McCall
Consumer Attorneys
2290 East Speedway Blvd.
Tucson, AZ 85719
T: 602-807-1504
F: 718-715-1750
E: srotkis@consumerattorneys.com

*Attorneys for Plaintiff,*
*Charles McCall*

22