CLERK'S OFFICE U.S. DISTRICT COURT AT
ROANOKE, VA
FILED

7/10/2026

LAURA A. AUSTIN, CLERK
BY: s/C. Kemp
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | | |
|---|---|---|
| CHARLES MCCALL, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 4:24-cv-00011 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| EXPERIAN INFORMATION | ) | By:   Hon. Thomas T. Cullen |
| SOLUTIONS, INC., | ) | United States District Judge |
| | ) | |
| Defendant. | ) | |

This matter is before the court on Defendant Experian Information Solution, Inc.'s ("Experian's") motion to exclude or limit the opinions and testimony of Plaintiff Charles McCall's proposed expert witness, Douglas Hollon. (Experian Mot. Exclude ("Experian Mot.") [ECF No. 102].) McCall seeks to call Hollon as an expert and have him opine, consistent with the opinions outlined in his expert report (the "Hollon Report"),[1] about the purported inadequacies of Experian's policies and procedures for verifying and reporting information about a consumer's death. (Hollon Rep. [ECF No. 103-1].) For the reasons explained below, the court will grant Experian's motion in part and limit the opinions Hollon may offer.

## I.   BACKGROUND

Because this matter involves extensive and technical facts, the court dispenses with a full recitation of the facts and circumstances underlying the Amended Complaint. But, to

---

[1] For clarity, the court follows the Hollon Report's original page numbering rather than the page numbers in the docket header.

provide context for the instant motion, the court will briefly describe the mechanics of credit reporting and deceased notations, the Hollon Report and its main conclusions, and the parties' arguments related thereto.

### A.  Mechanics of credit reporting and deceased notations

Experian is a consumer reporting agency ("CRA"). (*See* Experian Br. Supp. Mot. Summ. J. ¶ 1 ("Experian MSJ") [ECF No. 101].) CRAs receive information, or so-called "tradelines," about a consumer's credit information and payment history from data furnishers, such as banks, credit unions, credit-card issuers, lenders, public-record vendors, and similar institutions, often through contractual agreements. (*Id.* ¶¶ 2–4; Hollon Rep. at 6.) CRAs collect the tradelines and collate that information into a consumer report, which it makes available to various lenders, including credit-card companies, banks, and other lenders.  (*Id.*)

Among other things, tradelines indicate whether a consumer is deceased. (Experian MSJ ¶ 5 (explaining that industry guidance instructs data furnishers "not to report this information unless and until the creditor has 'received a legally sufficient death notice; *e.g.*, death certificate'" (citation omitted) (cleaned up)).) When Experian receives information that a consumer is deceased, it marks the consumer's file with a "deceased notation." (*Id.* ¶ 6.) Deceased notations are important because, if an account with a deceased notation remains active, then consumers, businesses, and CRAs are on notice of potential fraud or identity theft. (*Id.* ¶ 7; Hollon Rep. at 11.) Experian may also learn that an individual is deceased from the decedent's family, creditors or banks of the decedent, or the Social Security Administration's ("SSA's") Limited Access Death Master File, which maintains a record of millions of deaths that have been reported to the SSA. (Experian MSJ ¶ 8.)

Under the Fair Credit Reporting Act ("FCRA"), when reporting consumer information, CRAs must "follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b). To comply with its statutory obligation, Experian claims that it employs myriad procedures on the front end to vet, credential, and "verify the reliability" of information supplied by data furnishers, including credit-card companies, like Capital One. (Experian MSJ ¶¶ 9–18.) Under FCRA, data furnishers are also required to furnish CRAs with accurate data about the consumer, *see* 15 U.S.C. § 1681s-2(a), and Experian's contracts with data furnishers include provisions requiring compliance with FCRA's provisions. (Experian MSJ ¶¶ 17–18.) On the back end, Experian also employs an internal system check, the Equal Credit Opportunity Act Deceased Indicator (Code X) Maintenance procedure ("deceased-notation maintenance procedure"), to detect when a data furnisher may be errantly reporting that a consumer is deceased. (*Id.* ¶ 20; Hollon Rep. at 19.) Monthly, the procedure flags consumer profiles where

> (a) only a single data furnisher is reporting a deceased notation; (b) the consumer is not found in the [SSA's] master death file; (c) the data furnisher first reported the deceased indicator more than 60 days ago; and (d) there are new non-collection trades on file or other meaningful trade updates after the deceased notation was reported.

(Experian MSJ ¶ 20.) When all criteria are met, the deceased-notation maintenance procedure removes the deceased notation from the consumer's file. (*Id.* ¶ 21.)

In his Amended Complaint, McCall alleged that Capital One provided Experian with incorrect information that McCall was deceased, which Experian then incorporated into McCall's credit report and provided to a third party. (Am. Compl. ¶¶ 151–53 [ECF No. 49].)

As a result, he was denied financing for his business and could not open a credit account with Capital One. (*Id.* ¶¶ 163–78; Experian MSJ ¶¶ 30, 37.) Following protracted discovery and Experian's motion for partial summary judgment (which McCall opposes), McCall persists in the view that Experian maintains unreasonable and inadequate procedures that allow it to falsely report a living consumer as deceased, both because (a) Experian does not adequately vet its data furnishers, like Capital One, for informational accuracy, and (b) its deceased-notation maintenance procedure is inadequate. (*See* McCall Br. Opp'n Summ. J. at 9–20 [ECF No. 116].) To support these critical assertions, and prevail at trial, McCall intends to offer Hollon as an expert witness. (McCall Witness List at 5 [ECF No. 95].)

## B. The Hollon Report

The Hollon Report overarchingly concludes, and Hollon would so testify, that Experian's procedures for ensuring the accuracy of deceased notations in consumer files and reports are unreasonable. (Hollon Rep. at 20.) Specifically, Hollon opines that

> Experian wrongly reported that Plaintiff was deceased, when, in fact he was alive, and Experian knew or should have known he was alive . . . .[;]
> Experian failed to have mechanisms in place to avert reporting a person as deceased, when that person was not deceased. . . .[;]
> Experian failed to follow adequate procedures to ensure accuracy. . . .[;]
> Experian's failure to have adequate procedures to assure accuracy resulted in inaccurate, damaging information being reported about Plaintiff by Experian. . . .[;]
> [I]naccurate deceased reporting is very often more harmful to consumers than other types of inaccuracies[.]

(*Id.* at 4–5.)

To support his conclusions, Hollon opines that Experian does not adequately verify the information that its data furnishers report and, instead, accepts (and disseminates) it at

face value. (*Id.* at 4–5, 44 ("If Experian had adequate procedures to assure accuracy, it would have verified the inaccurate information before reporting the information on Plaintiff's file/report. . . . [T]here is no relationship between Experian's vetting/credentialing procedures and the actual accuracy of a data furnisher's information").) Instead, Hollon opines that, upon receiving a tradeline that indicates a consumer is deceased, Experian should verify the death with the appropriate county or state vital records office. (*See id.* at 18–19 ("Verifying death records would be similar to verifying other county/state records, such as judgments, tax liens, criminal records, etc., a practice already conducted by many companies, such as [CRAs].").) He also questions why Experian "does not require proof from a data furnisher who reported a consumer as deceased" before adding a deceased notation to the consumer's file, when it requires that proof from people who directly report the consumer's death to Experian. (*Id.*)

As for Experian's deceased-notation maintenance procedure, Hollon noted that, while Experian employs a protocol for verifying deceased notations, it "is inadequate to ensure maximum possible accuracy" because it "allows for these inaccuracies to be reported and then remain in a consumer's file for at least 60 days (depending on what point in the month the procedure runs)." (*Id.* at 20 (suggesting that Experian should "temporarily suppress deceased notations until they are corroborated by a second source").)

Finally, regardless of the reasonableness of its procedures, Hollon opines that Experian did not follow them when it failed to remove the deceased notation from McCall's file, despite being privy to various indicia that he was still alive. (*See id.* at 20–21, 50 (stating that Experian received an inquiry about McCall in June 2022 in reference to an employment application and also received notice in October 2023 that McCall opened a credit account, which should have

prompted Experian to remove the deceased notation from his file earlier than December 2023; "[T]his was not the first case where Experian's [procedures] failed to work.").) Hollon concludes by opining that Experian's unreasonable procedures, as well as its failure to follow those procedures, were proximate causes of McCall's damages. (*Id.* at 52.)

### C. The parties' arguments

Experian seeks to exclude Hollon from testifying as an expert witness, *see* Fed. R. Evid. 702, on multiple grounds. As to Hollon's qualifications, Experian argues that Hollon, who was previously employed by Experian, lacks the "specialized knowledge" necessary "to opine on Experian's policies and procedures for deceased notations," arguing that much of Hollon's "purported expertise on Experian's policies was developed solely for the purposes of testifying as an expert witness against his former employer." (Experian Br. Supp. Mot. Exclude 5–6 ("Experian Br.") [ECF No. 103] (cleaned up).)

In response, McCall points to Hollon's 20-year tenure in the consumer reporting industry, including with Experian as a consumer dispute specialist and acting as its corporate representative during various litigation. *See* Fed. R. Civ. P. 30(b)(6). (McCall Opp'n at 2–4, 9–14 [ECF No. 114].) McCall also highlights that Hollon has previously been designated as a credit-reporting expert in courts across the country. (*Id.* at 9–10 (listing cases).)

Regardless of his purported qualifications as a credit-industry expert, Experian devotes the lion's share of its argument to attacking the methodology, and thus the reliability, of his proffered opinions related to its data-furnisher vetting procedures and confirmation procedures for death notifications. Experian contends that "Hollon's opinions rest on bare *ipse dixit* rather than reliable methods and are full of errors." (Experian Br. at 6.) It argues that

Hollon failed to apply—or, at the very least, describe—a concrete methodology or support his conclusions with a sufficient factual basis, other than his "experience, skills, and knowledge." (*Id.* at 10, 16 ("Hollon's opinions regarding the reasonableness of Experian's procedures consist of little more than his dogmatic beliefs about Experian's procedures and his own assurances of the reliability of that opinion.").) Instead, Experian argues that the Hollon Report is replete with unhelpful, speculative, unsubstantiated, and erroneous conclusions that Experian's deceased reporting policies are unreasonable. (*Id.* at 6–18.)

McCall opposes, arguing that Hollon need not do more than base his opinions on his "experience and specialized knowledge," as applied "to the facts and evidence in a case." (McCall Opp'n at 14–15 ("[Hollon's] opinion is reliable and relevant because he specifically explained how and precisely why Experian's [deceased-notation maintenance procedure] was not adequate to assure accuracy with respect to deceased notations.").)

## II.    LEGAL STANDARD

Federal Rule of Evidence 702 governs the admissibility of expert witnesses, along with the Supreme Court's decisions in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), and *Khumo Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999). Collectively, these require the trial court to ensure that the proffered expert testimony is both relevant and reliable. *Daubert*, 509 U.S. at 589. "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably

applied the principles and methods to the facts of the case." Fed. R. Evid. 702. "The question of whether a witness is qualified to testify is context-driven and can only be determined by the nature of the opinion he offers." *RG Steel Sparrows Point, LLC v. Kinder Morgan Bulk Terminals, Inc.*, 609 F. App'x 731, 738 (4th Cir. 2015) (cleaned up) (unpublished). Ultimately, the court's objective should be to ensure "that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co.*, 526 U.S. at 152. Although the court must act as the gatekeeper for expert opinions, it must be mindful "that the traditional and appropriate means of challenging expert testimony are vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Kovari v. Brevard Extraditions, LLC*, 461 F. Supp. 3d 353, 369 (W.D. Va. 2020) (cleaned up). Nevertheless, reliability and relevancy are well-established prerequisites for the admissibility of expert testimony. *See Sardis v. Overhead Door Corp.*, 10 F.4th 268, 282 (4th Cir. 2021) (citing *Nease v. Ford Motor Co.*, 848 F.3d 219, 229 (4th Cir. 2017)). And courts may not "abandon the gatekeeping function." *Nease*, 848 F.3d at 230 (quoting *Kumho Tire Co.*, 526 U.S. at 158–59 (Scalia, J., concurring)).

"The proponent of expert testimony has the burden of establishing its admissibility by a preponderance of proof." *Smith v. Wyeth-Ayerst Lab'ys Co.*, 278 F. Supp. 2d 684, 691 (W.D.N.C. 2003) (citing *Daubert*, 509 U.S. at 592 n.10). "[A]ny expert . . . must have the specialized knowledge or skill in the specific area in which the testimony is proffered." *Id.* at 698. If an expert is not qualified in the first place, the court's gatekeeper function under Rule 702 mandates exclusion of his/her testimony in that area of non-expertise. *See Daubert*, 509

U.S. at 589, 597; *Kumho Tire Co.*, 526 U.S. at 147 (holding that *Daubert*'s "gatekeeping obligation" applies to all expert testimony).

"[D]ue to the difficulty of evaluating their testimony, expert witnesses have the potential to be both powerful and quite misleading." *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir 2001) (citations omitted). "[G]iven the potential persuasiveness of expert testimony, proffered evidence that has a greater potential to mislead than to enlighten should be excluded." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999). Assuming that the evidence is reliable, the court must ask whether it will "assist the trier of fact to understand or determine a fact in issue." *Md. Cas. Co. v. Therm-O-Disc, Inc.*, 137 F.3d 780, 783 (4th Cir. 1998) (quoting *Daubert*, 509 U.S. at 592). "Trial judges have 'considerable leeway' in excluding evidence, and are required to ensure that 'expert testimony must be based on sufficient facts or data, and the expert must arrive at his opinions by properly applying reliable principles and methods to the facts.'" *McCulloch v. Tahsin Indus. Corp., USA*, No. 6:20-cv-00035, 2022 WL 4484214, at *12 (W.D. Va. Sept. 27, 2022) (quoting *Hickerson v. Yamaha Motor Corp.*, 882 F.3d 476, 480 (4th Cir. 2018)).

## III.    DISCUSSION

As discussed above, to testify as an expert, Hollon must be qualified through his education, training, or experience, and his opinions must be relevant and reliable. *See Daubert*, 590 U.S. at 589; Fed. R. Evid. 702. The court first considers McCall's qualifications.

Insofar as McCall seeks to introduce Hollon as "a credit expert," the court agrees that he is qualified to opine, as a general matter, on the credit-reporting industry and the role of companies like Experian. (*See* McCall Witness List at 5 (noticing Hollon generally as "a credit

expert"); McCall Opp'n at 9 (arguing that Hollon is qualified "to testify about industry standards and practices in consumer reporting").) In the "Qualifications and Methodology" section of his report, Hollon—the owner of Credit Experts of North Texas, LLC—states that he holds a bachelor's degree in business finance, as well as multiple certifications from the Consumer Data Industry Association ("CDIA"). (Hollon Rep. at 2–3.) He has also completed multiple training courses from financial and credit-reporting agencies. (*Id.* at 3.)

In terms of his professional experience, Hollon began working with Experian in 2005, assisting consumers with disputes over their consumer files. (*Id.* at 2.) He was eventually promoted to handling escalated credit-report disputes, which were often submitted by attorneys, the Better Business Bureau, or government agencies, with the Experian Consumer Affairs department. (*Id.*) Hollon also reviewed and investigated "reseller disputes" and "information received from public[-]record vendors, including the reliability of that information." (*Id.* at 3 (cleaned up).) During his time with Experian, Hollon also worked with lobbyists, assisted "high profile consumers," and served as the Alternate Custodian of Records. (*Id.* at 2 (cleaned up).) Later in his tenure, Hollon was considered a "subject matter expert" and served as Experian's corporate designee in approximately 20 FCRA cases. (*Id.* at 3.) Hollon stopped working for Experian in 2019. (*Id.* at 59.)

Hollon states that he "received specialized training involving fraud (identity theft) disputes and mixed file disputes"[2] and is familiar with Experian's database used to store

---

[2] "A mixed credit file occurs when information belonging to more than one person is unintentionally combined in a credit bureau's database." Equifax, *What is a mixed credit file?* (accessed June 26, 2026), *available at* https://www.equifax.com/personal/help/article-list/-/h/a/what-is-a-mixed-credit-file/.

consumer reporting data ("File One"). (*Id.* at 2–3.) Hollon stated that his duties required him to explain "credit scores and score factors . . . to consumers, attorneys, federal and state congressman, State Attorney General personnel, and other government agencies." (*Id.* at 3.) In addition to being "well-versed in [Experian's] policies, procedures, processes, and operations," as well as the requirements of FCRA, Hollon stated that he regularly speaks at industry events and studies recent developments in "credit dispute operations." (*Id.*) Indeed, Hollon has been admitted as a credit-reporting expert in a multitude of state and federal cases nationwide, including cases involving disputes over faulty, misleading, or incorrect credit reports. *See, e.g.*, *Garcia Delgado v. Experian Info. Sols.*, No. 4:24-cv-637, 2026 WL 674189 (E.D. Tex. Mar. 10, 2026); *Huizar v. Experian Info. Sols., Inc.*, No. 4:22-CV-85, 2025 WL 3085049 (N.D. Ind. Nov. 5, 2025); *Panchenko v. Comenity Cap. Bank*, No. 23-cv-04965, 2025 WL 2372597 (N.D. Cal. Aug. 13, 2025); *Wright v. HireRight LLC*, No. CV-23-00493, 2025 WL 928852 (D. Ariz. Mar. 27, 2025). (*See also* Hollon Rep. at 54–57 (listing matters in which he provided expert testimony, depositions, and/or reports on credit reporting).)

The court agrees that Hollon is qualified, at the threshold, to opine on general matters of credit reporting based on his educational background, training, and experience in this industry. As a result, many of Experian's grievances with Hollon's qualifications are better suited for robust cross examination or closing argument.[3] (*See* Experian Br. at 4–6

---

[3] Experian argues that "[j]ust because other courts have found Hollon qualified to testify in other cases involving different facts and procedures at issue does not mean he is qualified to testify in all consumer reporting cases under the FCRA." (Experian Reply at 3 [ECF No. 128].) While Experian's point is well-taken, the court believes that accepting it would impose undue strictness on the otherwise "liberal approach to qualifications under Rule 702." *See Nucor Corp. v. Bell*, No. 2:06-CV-02972, 2008 WL 4442571, at *9 (D.S.C. Jan. 11, 2008) ("'One knowledgeable about a particular subject need not be precisely informed about all details of the issues raised in order to offer an opinion.' . . . Rule 702 reflects the common-sense notion that a jury can adequately determine how much weight to assign a witness's testimony according to the quantity and quality of his or her education,

(characterizing Hollon as a "disgruntled" former employee).) *See also Garcia Delgado*, 2026 WL 674189, at *2 n.1 (stating that similar challenges to Hollon's qualifications were "more suited for closing argument than the Court's Rule 702 analysis").

But that is far from the end of the matter, as McCall also seeks to have this expert testify about the minutia of specific policies and procedures related to the vetting of industry partners and the handling of death notifications. Hollon's opinions on these topics must be "based on sufficient facts" and flow from "reliable principles and methods" as applied "to the facts of the case." Fed. R. Evid. 702. *See also Thorpe v. Va. Dep't of Corr.*, No. 2:20CV00007, 2024 WL 4298779, at *3 (W.D. Va. Sep. 26, 2024) ("Objective bases must show that the expert used reliable principles and methods to reach the conclusion."). When assessing the reliability of an expert's purported methodology, courts consider a non-exhaustive list of factors, including

> "whether a theory or technique . . . can be (and has been) tested," "whether the theory or technique has been subjected to peer review and publication," the "known or potential rate of error," the "existence and maintenance of standards controlling the technique's operations," and whether the theory or technique has garnered "general acceptance."

*Nelson v. Experian Info. Sols., Inc.*, No. 2:23-1634, 2024 WL 3219180, at *1 (D.S.C. June 27, 2024) (quoting *Daubert*, 509 U.S. at 593–94). When assessing the factual bases for the expert's opinion, courts should "focus[] not on what the experts say, or their qualifications, but what

---

knowledge, skill, experience, and training." (quoting *Thomas J. Kline, Inc. v. Lorillard, Inc.*, 878 F.2d 791, 799 (4th Cir. 1989))). In any event, as discussed below, Hollon's opinions about Experian's deceased-notation maintenance procedures will be excluded. *See, e.g.*, *Abu-Eid v. Discover Prods., Inc.*, 589 F. Supp. 3d 555, 563 (E.D. Va. Mar. 8, 2022) (admitting expert to opine on credit reporting matters but excluding portions of his testimony related to the national security clearance process because he did not have specific experience in that subject area).

basis they have for saying it." *Oatway v. Experian Info. Sols., Inc. et al.*, No. 2:24-cv-00523, 2025 WL 2689029, at *7 (W.D. Wash. Sep. 19, 2025) (quoting *United States v. Holguin*, 51 F.4th 41, 854 (9th Cir. 2022)).

In other (and more common) contexts (*e.g.*, identity-theft matters), courts have deemed Hollon's opinions reliable. *See, e.g.*, *Huizar*, 2025 WL 3085049, at *5. But in other contexts (*i.e.*, deceased-notation matters), Hollon's opinions have been excluded because those courts found that his opinions were not grounded in reliable principles and methods. In *Nelson v. Experian Information Solutions, Inc.*, a case in which Hollon was offered as an expert witness, the plaintiff sued Experian based on an incorrect deceased notation on his credit report, then proffered Hollon's opinion that Experian "failed to follow reasonable procedures to assure maximum possibl[e] accuracy" and improperly relied on data furnishers to verify consumers' deceased status.[4] 2024 WL 3219180, at *3. The court, however, found Hollon's opinions unreliable because he did not

> articulate concrete factual materials or sources on which he bases his conclusion . . . . [He] cite[d] no reports, research, or other reliable material in reaching this conclusion. Nor [did] he explain how his professional background, experience, or training allow him to arrive at either of the above conclusions.

*Id.* at *2. Accordingly, the court excluded his opinions regarding the reasonableness of Experian's procedures but allowed him to opine as to the general "sorts of damages that are typically caused by errors on credit reports." *Id.* at *3.

---

[4] As he seeks to do here, Hollon also opined in *Nelson* that, had Experian "had reasonable procedures to assure maximum possible accuracy, it would have verified a deceased notation reported by a data furnisher before storing the information on an [individual's] file." 2024 WL 3219180, at *2 (brackets in original). Hollon further opined in *Nelson* that "by Experian relying on a faulty [maintenance] procedure, Experian does not have reasonable procedures to ensure maximum possible accuracy." *Id.*

A year later, another court also limited Hollon's opinions—which are substantially similar to the ones outlined in his expert report in this case[5]—for want of reliability. *See Oatway*, 2025 WL 2689029, at \*10. First, the court found that Hollon offered only conclusory opinions, notably failing to explain why the defendant's failure to verify information it received from data furnishers "failed to assure maximum possible accuracy." *Id.* (observing that Hollon did not explain what the defendant should have done to ensure accuracy or how its current verification "process deviated from industry standards"). Second, according to the court, Hollon did not explain his methodology, instead only reciting "the steps for a typical consumer dispute" without explaining the connection to his conclusions. *Id.* at \*11. Third, because many of Hollon's conclusions were obvious or were mere "commentary on other evidence in the record," they were unhelpful to the trier of fact. *Id.* at \*10 (underscoring that an expert cannot simply recite facts "detached from [the] accompanying analysis"). Accordingly, the court excluded Hollon's opinions in large part, allowing him to opine only as to the general damages a consumer may suffer from erroneous credit reports. *Id.* at \*11.

Here, the Hollon Report suffers from the same threshold reliability deficiencies identified by the district courts in *Nelson* and *Oatway*. First, with respect to Hollon's purported methodology, Hollon vaguely asserts that he applied his "specialized knowledge, skills, experiences, training[,] and education" to "a methodology which helps the trier of fact." (Hollon Rep. at 3–4; *see also* Hollon Dep. 24:10–20 [ECF No. 103-2].) But the court is unable to discern what that methodology actually is because Hollon never expounds upon it, thereby

---

[5] Though Hollon's report in *Nelson* differed from the Hollon Report here—the *Nelson* report is more bare-bones—the court finds that the *Oatway* report is a strong comparator, given substantially similar (and sometimes boilerplate) language, methodology, findings, and reasoning in both.

- 14 -

inhibiting a meaningful *Daubert* analysis. *See Daubert*, 509 U.S. at 593–94; *see also Oatway*, 2025 WL 2689029, at \*11. While McCall correctly points out that "an expert can produce a reliable opinion by applying his experience and specialized knowledge to the facts and evidence in a case," he still must explain what that specialized, experiential knowledge consists of, from where (or what) it stems, and how it applies to the specific facts at issue. (McCall Opp'n at 14.) Hollon's proffered opinions fall short of these standards. For instance, he fails to identify, at minimum, what specific experience he possesses in the deceased-notation field, such that his opinions on the matter reliably flow from that experience.[6] (*See* Hollon Rep. at 2–4, 11–12 (describing Hollon's general experience in consumer disputes but lacking specific references to his experience in deceased-notation maintenance procedures).) *See also Nelson*, 2024 WL 3219180, at \*2.

The lack of discernible, experience-based methodology reveals another flaw in Hollon's opinions, chiefly that they lack concrete factual bases. To the contrary, they are impermissibly based on his own say so. *See Gen. Elec. Co. v. Joiner*, 552 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."); Fed. R. Evid. 702. For example, Hollon concludes that Experian's deceased-notation maintenance procedures are "inconsistent with the 'maximum possible accuracy standard' in consumer

---

[6] Hollon briefly mentions that, when he worked for Experian, he explained to consumers what deceased-notation error codes meant on their accounts, but that experience does not adequately explain his expertise in deceased-notation maintenance procedures or how Experian vets its data furnishers. (*See* Hollon Rep. at 12.) Then, in his Opposition, McCall argues that Hollon "learned precisely how inaccurate deceased notations affect lending decisions, as distinct from inaccuracies about other matters, like a consumer's payment history or the amount of a consumer's outstanding debt." (McCall Opp'n at 20.) This interpretation, however, is not substantiated by the Report, as Hollon does not indicate that he has more than tangential experience in deceased notations.

- 15 -

reporting"; that "Experian could easily make its procedure the inverse and temporarily suppress deceased notations until they are corroborated by a second source," such as the appropriate county or state vital records office; that the protocol in place "did not operate as intended"; and that the vetting procedures are similarly deficient. (*See* Hollon Rep. at 18–20, 39–45, 52.) But despite being offered to opine "about whether Experian's procedures are reasonable *in light of industry standards*" (McCall Opp'n at 24 (emphasis added)), Hollon never explains—at least with any convincing detail—what Experian's policies entail, let alone compares those policies to those of other CRAs or a specific industry standard. He merely notes, at a high level of generality, that the industry requires accuracy.[7] *See Nelson*, 2024 WL 3219180, at *2; *Johns v. Nelnet, et al.*, No. 22-4791, 2026 WL 914621, at *15 (E.D. Pa. Mar. 31, 2026) ("[W]hile Hollon makes numerous references to his reliance on 'industry standards,' he is unable to articulate what these standards are."). Moreover, during his deposition, Hollon stated that he "couldn't tell" whether there was an on-point industry standard for one of the issues presented in this case—that is, whether a CRA can rely on a data furnisher's information without independently verifying that information. (Hollon Dep. at 214:6–13.) Even though Experian's policies may be unreasonable in Hollon's eyes, he must explain why he believes that, based on reliable and well-established principles and standards, to meet the standards of *Daubert* and the Federal Rules of Evidence. He fails to do so.

---

[7] Although Hollon devotes sections of the Report to describing the credit-reporting industry's emphasis on accurate reporting, his analysis is replete with generalities. Hollon clearly establishes that the industry (and federal law, for that matter) requires CRAs to achieve maximum accuracy in their handling of consumer information, but the Report does not identify a specific mandate or industry standard that renders Experian's policies unreasonable in comparison. (*See* Hollon Rep. at 9–10 (listing government and industry definitions for the term "accuracy" and that data furnishers and CRAs "have independent obligations under the FCRA related to the accuracy of information and to the investigation of consumer disputes" (citations omitted)).)

To be sure, Hollon attempts to root many of his general conclusions in his knowledge, education, and training, which, as McCall correctly argues, may justify an expert's opinions under certain circumstances, such as providing a general overview of how the specialized industry of credit reporting works. (*See* McCall Opp'n at 14–15, 18–19.) But specific conclusions require specific connections, and Hollon does not make them. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 157–58 (1999); *SAS Inst., Inc. v. World Programming Ltd.*, No. 5:10-CV-25, 2015 WL 13878192, at *8 (E.D.N.C. Nov. 5, 2025) ("A reliable expert opinion grounded in the expert's experience, training, or education must connect the expert's background to his ultimate conclusion. . . . The more specific the expert's proffered opinion, the more concrete that connection must be."); Fed. R. Evid. 702 advisory committee note to 2000 amendments ("If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.").

As another example, Hollon reviewed the deposition testimony of Peter Henke, Experian's current corporate designee, and ultimately concluded that Experian did not reasonably vet its data furnishers or independently verify the accuracy of the information it received from Capital One. (*See* Hollon Rep. at 39–44.) But, in addition to failing to connect those conclusions to his experience with Experian's vetting procedures, Hollon impliedly conceded that he never had firsthand knowledge of those procedures to begin with. In his deposition, Hollon testified that, as an Experian employee,

> I understood at a high level that Experian performed some sort of vetting, [but] I was never provided information about how that vetting actually related to accuracy of a data furnisher's credit information[.]

- 17 -

(*Id.* at 44.) Without a sufficient understanding of the vetting policies at issue, Hollon's

conclusions lack the necessary experiential basis.[8] (*Id.* at 59.) Boiled down, Hollon's proffered

opinions derive from partially informed hunches which were formulated specifically for this

litigation. (*See, e.g.*, *id.* at 44 ("*Knowing now what Mr. Henke's testimony has confirmed*, the past

testimony of Experian's . . . witnesses makes clear that Experian's own witnesses routinely

provide vague, general information about the vetting process and its relationship to data

accuracy." (emphasis added).) This militates against admission. *See Wehling v. Sandoz Pharm.*

*Corp.*, 12 F.3d 115, at *3 (4th Cir. 1998) (per curiam) (unpublished)*; Oatway*, 2025 WL 2689029,

at *10; *Nelson*, 2024 WL 3219180, at *2; *Johns*, 2026 WL 914621, at *15 (excluding Hollon's

opinions in identity-theft matter because he did not explain "*what* in his experience, skills, or

knowledge [he] draws upon in reaching [his] conclusion[s].").

Additionally, some of Hollon's most significant conclusions are riddled with analytical

gaps and inconsistencies. *See Joiner*, 522 U.S. at 146 ("A court may conclude that there is simply

too great an analytical gap between the data and the opinion proffered."). For example, Hollon

suggests that, upon receiving a tradeline from Capital One that reported McCall as deceased,

Experian should have verified that information with state and county vital records offices

before placing a deceased notation in McCall's file. (*See* Hollon Rep. at 18–19, 33 ("[I]n my

---

[8] In response to Experian's argument that Hollon's familiarity with Experian's data-furnisher vetting policies is outdated, McCall argues that, "because CRAs do not make their policies and procedures public, . . . . only current employees of Experian would be able to provide expert opinions," which Experian would not allow. (McCall Opp'n at 13–14.) He asserts that "regularly testifying experts," like Hollon, "are often the only people who have a comprehensive knowledge of how industry standards are actually applied by CRAs." (*Id.* at 13.) Whether or not this statement is true, the court's role is not to resolve an evidentiary dilemma for McCall. Here, the only question that has been presented to the court is whether Hollon may be admitted as an expert. It remains that many of Hollon's opinions are based on unreliable principles, and the court must exclude them.

experience and knowledge of working in the consumer reporting industry, and working at

Experian, the most reliable source of a person truly being deceased was receipt of a death

certificate or similar document."); *see also* Hollon Dep. at 109:24–111:5, 113:13–20.) But

Hollon does not explain how his research on "the process of reporting a person as deceased"

supports the jump to his conclusion that Experian acted unreasonably by not verifying

McCall's "death" with vital records offices. (Hollon Rep. at 18.) And, as Experian points out,[9]

this recommended alternative is based on an "inaccurate factual foundation," and in its role

as the gatekeeper, the court has an obligation to exclude it.[10] *Fernandez v. Spar Tek Indus., Inc.*,

No. 0:06-3253, 2008 WL 2185395, at *6 (D.S.C. May 23, 2008); *Oatway*, 2025 WL 2689029, at

*10 (explaining that expert's "failure to address a key factor in determining whether [the

defendant complied with the maximum possible accuracy standard] undercuts both the

methodology he used to reach his conclusion as well as the reliability of the conclusion itself").

(*See* Experian Br. at 12–15; Experian Reply at 8–9 [ECF No. 128].)

---

[9] To repeat, Hollon opined that "the best source to determine if a person was deceased or not[] would be to verify the records at the county vital records office of the county the person resided or where the death was recorded," or to verify the records at the state level. (Hollon Rep. at 17–18.) Experian, in response, asserts that this alternative is "legally and practically impossible" because Virginia law only releases information about a person's death to entities with a "direct and tangible interest in the content of the record and that the information . . . is necessary for the determination or protection of personal or property rights." (Experian Br. at 14–15; Experian Reply at 8 (cleaned up) (citing 12 Va. Admin. Code § 5-550-470(A).) McCall does not contest that Experian does not qualify as an entity with a "direct and tangible interest" in a consumer's death, as defined by 12 Va. Admin. Code § 5-550-470(B)-(E), and Hollon's deposition only calls his conclusions further into question. (*See* Hollon Dep. at 118:13–119:5; 123:18–124:10, 129:3–11, 132:19–134:1, 137:22–138:3 (testifying that he based his conclusions on interviews with state vital records offices, including Virginia's, but he did not interview the vital records office in Henry County, Virginia, where McCall resides; representing that he believes Experian has the capability to verify deaths with vital records offices because Experian verifies other types of public records; stating that, without reviewing his research, he could not say what exceptions Virginia law allows with respect to non-immediate family members obtaining information about a person's death).)

[10] Experian also identifies other discrepancies in Hollon's factual assumptions (*see* Experian Br. at 11–12; Experian Reply at 6–7 (arguing that Hollon misinterprets the timing of the deceased-notation maintenance procedure)) that McCall does not address in his Opposition, aside from summarizing Hollon's related conclusions (*see* McCall Opp'n at 4–6).

Ultimately, it is not the court's role to agree, or disagree, with the expert's opinion. But it must nevertheless ensure that proffered expert testimony meets the requirements of Rule 702, and that the jury is not misled, or confused, by the inchoate and speculative views of those who, by dint of their apparent qualifications, possess the imprimatur of special authority. Accordingly, because Hollon failed to adequately explain his methodology, and because his conclusions are either speculative, potentially erroneous, or insufficiently based in fact, the court will exclude his opinions regarding the reasonableness of Experian's data-furnisher vetting procedures and its deceased-notation maintenance procedure.

Despite excluding Hollon's opinions on the reasonableness of Experian's procedures, and having already found him qualified as a general credit-reporting expert, the court will, in addition to allowing him to provide a general overview of the credit-reporting industry, permit Hollon to opine on the general damages that may arise from faulty credit reports.[11] (*See, e.g.*, Hollon Rep. at 5, 11–12 (opining generally that "inaccurate deceased reporting is very often more harmful to consumers than other types of inaccuracies" and that inaccurate reporting "may cause higher interest rates on loans, the reduction of credit limits on credit card accounts, higher insurance rates, denial of housing, or the possibility of not being selected for certain employment positions").) *See also Oatway,* 2025 WL 2689029, at *11 ("The Court finds, however, that Hollon is qualified to speak, in general terms and as found relevant at trial, about the sort of damages that are typically caused by errors on consumer reports."); *Garcia Delgado,*

---

[11] During the deposition, Experian represented that he would opine about McCall's specific damages, which Experian highlights is different from McCall's intention to introduce him to speak about general damages. (*See* Experian Reply at 9–10 (comparing McCall's intention to introduce Hollon to speak about general damages and Hollon's deposition testimony stating that would speak to McCall's denial of Capital One credit (citing McCall Opp'n at 19; Hollon Dep. 178:17–20)).) Whatever McCall's initial intentions, the court clarifies that the denial of Capital One credit is a McCall-specific injury, and Hollon is not permitted to testify about it.

2026 WL 674189, at *3 (limiting Hollon's discussion to the kinds of damages suffered from a false consumer report); *Nelson*, 2024 WL 3219180, at *3.

But Hollon may not opine as to McCall's specific economic damages; McCall must speak to those himself. Moreover, Hollon may not offer any opinions about McCall's purported emotional damages; it is undisputed that he does not possess the appropriate qualifications to opine about that. *See Nelson*, 2024 WL 3219180, at *3; *Oatway*, 2025 WL 2689029, at *11. If McCall wishes to recover emotional damages, he "may testify about how the alleged credit reporting inaccuracies impacted him physically, emotionally, and economically." *Nelson*, 2024 WL 3219180, at *3 (quoting *Valenzuela v. Equifax Info. Servs. LLC*, No. CV-13-02259, 2015 WL 6811585, at *3 (D. Ariz. Nov. 6, 2015)).

## IV.    CONCLUSION

For the foregoing reasons, the court will grant in part Experian's motion to exclude.

The Clerk is directed to forward a copy of this Memorandum Opinion and accompanying Order to all counsel of record.

**ENTERED** this 10th day of July, 2026.

*/s/ Thomas T. Cullen*
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE